# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| VOLANDA JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CV 03-B-2437-S |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| VETERANS AFFAIRS; SOMERBY AT | ) | |
| UNIVERSITY PARK, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on Motion for Summary Judgment filed by Somerby at University Park, L.L.C.[1] (Doc. 27.) Plaintiff Volanda Jones has sued defendant, her former employer, alleging that it retaliated against her for filing an EEOC charge against the Department of Veterans Affairs. (Doc. 14 ¶¶ 23-24.) Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 27), is due to be granted.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is

---

[1]Defendant United States Department of Veterans Affairs was terminated on August 11, 2004. Plaintiff filed an Amended Complaint naming only Somerby as a defendant.

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255.  Nevertheless, the non-moving party need not be given the benefit of every inference but only of every ***reasonable*** inference.  *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. **STATEMENT OF FACTS**

Plaintiff began working for the Veterans Administration as an LPN in 1997.  (Doc.

27, Att. 2 at 111.)  In February 2002, she worked from 11:00 p.m. until 7:00 a.m. in order to

allow her to care for her ill son.  (*Id.*, Att. 6, ex. 5.)  According to plaintiff's counsel,

> In February of 2002, [plaintiff] was accused of refusing an order by a
> supervisor, which she denied.  Ultimately, [plaintiff] was reprimanded, but
> more significantly her shift was changed from 11:00 p.m. to 7:00 a.m., to a day
> shift approximately 7:00 a.m. to 2:00 p.m.   The management officials
> responsible for changing her shift were well aware that it would be impossible
> for [plaintiff] to work the day shift due to the needs of caring for her sick child
> and her other children.  [Plaintiff] against requested a move back to the 11:00
> p.m. to 7:00 a.m. shift for the reasons stated above and was denied.  As a
> result, she could no longer continue to work at the VA as the VA was insisting
> that the only shift they would allow her to work would be the 7:00 a.m. to 2:00
> p.m. shift.  [Plaintiff] used up all of her paid leave, vacation time, sick time,
> etc, and then in April had to go on leave without pay pending the resolution of
> her EEO charges and retaliation charges.

(*Id.*)

On April 8, 2002, while on leave from the VA, plaintiff began working for defendant.

(*Id.*, Att. 2 at 111, 114-15; *id.*, Att. 3, ex. 3 and ex. 5 at 9.)  Defendant "is a senior residential

community located in Birmingham, Alabama that provides independent living, assisted

living, and other care needs for its residents."  (*Id.*, Att. 4 ¶ 1.)  Jill Benefield, Health

Services Coordinator for defendant hired plaintiff for a position as a licensed practical nurse

["LPN"] on the evening shift.  (*Id.*, Att. at 114-15; *id.*, Att. 11 at 12, 37.)

The day after she began working for defendant, plaintiff applied for and was granted

FMLA leave from the VA from April 2, 2002 until June 21, 2002, based on her son's need

for "constant assistance *by his mother*" following throat surgery.  (*Id.*, Att. 3, ex. 5 at 9 (emphasis added).)  On June 22, 2002, she again applied for leave without pay from the VA until October 31, 2002, based on a statement from her son's physician stating that plaintiff needed to give her son "constant care" during that period.  (*Id.* at 10.)

In December 2002, an individual from the VA made a personal visit to Allison Naugher, defendant's Human Resources Director, asking about plaintiff's employment.  (*Id.*, Att. 5 at 14, 85-87.)  Naugher told the individual that defendant employed plaintiff, but she did not give the individual any other information.  (*Id.* at 87.)  Thereafter, around the beginning of February 2003, the VA contacted Naugher by telephone and requested verification of the dates of plaintiff's employment with defendant, which Naugher faxed to the VA.  (*Id.* at 80-81; *id.*, Att. 6, ex. 7.)

According to plaintiff, she had a conversation with Naugher on February 7, 2003, about a discrepancy in plaintiff's paycheck.  (*Id.*, Att. 2 at 139-40.)  During the course of the conversation, plaintiff testified, Naugher asked her why the VA was calling her and asking questions about plaintiff's employment with defendant.  (*Id.* at 140-41.)

Plaintiff called her attorney while in Naugher's office and Naugher told plaintiff's attorney about her contacts with the VA.  (*Id.* at 141-42.).  Plaintiff's attorney asked Naugher to provide him with a statement detailing her contacts with the VA.  (*Id.* at 143.)  At this time, plaintiff and her attorney told Naugher that she had filed an EEOC charge against the VA.  (*Id.*)  Plaintiff's attorney told Naugher that "the VA had changed [plaintiff's] shift from

4

11 p.m. - 7 a.m. to 7:30 a.m. to 4 p.m. in retaliation for the EEO charges and that [plaintiff] had to take unpaid leave from the VA because of this [change in her schedule] to care for [her] young son who suffers from Down's Syndrome." (*Id.*, Att. 3, ex. 2 ¶ 2(A).)

One week later, plaintiff asked Naugher if she had sent the statement to her attorney; Naugher said that defendant's counsel had told her not to become involved. (*Id.*, Att. 2 at 151-52.) Therefore, Naugher did not send the statement to plaintiff's counsel. (*Id.* at 152.) During this conversation, Naugher showed plaintiff the employment verification statement she had sent the VA and the VA's request for information, which asked for the times that plaintiff worked. (*Id.* at 151-54; *id.*, Att. 5 at 81-82; *id.*, Att. 6, ex. 7.) Naugher told plaintiff that she did not provide the VA with the additional information regarding the time of day she had worked. (*Id.*, Att. 5 at 84-85; *id.*, Att. 6, ex. 8.) Also, at this time, Naugher testified that plaintiff told her the VA was "trying to take her [nursing] license." (*Id.*, Att. 5 at 47.) Naugher also reported that plaintiff had told her that she was not "supposed to be working." (*Id.*, Att. 6, ex. 4 and ex. 6; *see also id.*, Att. 5 at 69-70; Doc. 30, Ex. 6.)

In late February 2003, plaintiff received a letter from the VA indicating that it was proposing to terminate her employment, in part, because she had misrepresented her requests for leave from April 2, 2002 until October 31, 2002, based on the fact that plaintiff had been working for defendant during this time. (*See id.*, Att. 2 at 130-32; *id.*, Att. 3, ex. 5 at 9-10.)

Around February 20, 2003, Naugher received complaints from three of plaintiff's coworkers, who told Naugher they were afraid to work with plaintiff and were otherwise

intimidated by plaintiff.  (*Id.*, Att. 5 at 50, 52-53; *id.*, Att. 6, exs. 1-3.)  Plaintiff's supervisor, Benefield,  also complained that plaintiff intimidated her and made her nervous.  (*Id.*, Att. 5 at 56-57; *id.*, Att. 11 at 35-36, 68-69.)

Chris Miranda, an LPN, complained to Naugher that plaintiff was angry and volatile, and that plaintiff had raised her voice, slammed materials, and otherwise acted inappropriately while plaintiff and Miranda were counting the medication cart.  (*Id.*, Att. 8 at 25-29, 40-41; *id.*, Att. 5 at 52-53, 55, 107; *id.*, Att. 6, ex. 2.)  Naugher's notes of her interview with Miranda state:

> Chris Miranda came to the HR office to share her unrest with Volanda Jones. Chris stated that she is "afraid" to work with Volanda because she is mean and intimidating.  Chris stated that Volanda keeps a tape recorder with her at work and this makes her (Chris) feel that she is being "set up."  Chris stated that whenever she has to do her medication counts with Volanda that she feels "picked on."  Chris shared with this office that she has tried to overlook the way Volanda treats her for a while, but lately it had become unbearable.  Chris stated that Volanda "scares" her to the point that she dreads working with her.

(*Id.*, Att. 6, ex. 2.)

Plaintiff denies being rude to Miranda.  (*Id.*, Att. 2 at 203.)  She also denies recording any of her coworkers, although she admitted she kept a tape recorder in a bag she brought to work.  (*Id.* at 22-23, 198, 205.)  She also argues that Naugher altered Miranda's statements because Miranda testified that she did not know plaintiff had a tape recorder at work.  (Doc. 30 at 7.)  Plaintiff misconstrues Miranda's testimony.

Miranda testified that she believed plaintiff had a tape recorder with her at work, even though she did not see the tape recorder.  (Doc. 27, Att. 8 at 42.)  She testified, "All the care

associates were talking about that, that [plaintiff] had stated that she had [a tape recorder]."
(*Id.*) Miranda also testified that "because of the talk about [plaintiff] having a tape recorder,"
she thought plaintiff might try to record her and that led to her complaint that she felt
plaintiff was setting her up.  (*Id.* at 45.)  The evidence is clear that Miranda believed plaintiff
had a tape recorder and that she complained about this to Naugher.

After receiving Miranda's complaint, Naugher questioned plaintiff's other coworkers.
(*Id.*, Att. 5 at 126-27.)  Shirley Beck, an LPN, told Naugher that she felt harassed by plaintiff,
and that she was scared of what plaintiff might do.  (*Id.* at 126, 136-37; *id*, Att. 6, ex. 1;  *id*,
Att. 9 at 10-11, 42, 47-48, 59-61, and ex. 1.)   Beck also told Naugher that she believed
plaintiff had altered a resident's medication record.  (*Id.*, Att. 9 at 26-31 and ex. 12; *see also*
*id.*, Att. 11, at 28 and exs. 5-6.)  Beck also testified that Gabrielle Warner, a Care Associate,
and other employees had told her that plaintiff was tape-recording them.  (*Id.*, Att. 9 at 45-
46.)  She also testified that she believed plaintiff was taping her based on plaintiff's conduct.
(*Id.* at 47-48.)

Naugher notes of her interview with Beck state:

Shirley Beck shared with the HR office that she feels intimidated by Volanda
and that she is "afraid" to work with her.  Shirley stated that Volanda keeps a
tape recorder on her person while at work and tapes Somerby employees while
they are working.  Shirley stated that Volanda shared with her that she
(Volanda) has "enough information on Somerby to sink this place."  According
to Shirley, Volanda approached her on February 14, 2003 and asked her,
"Shirley, how do you resign here?"  Shirley noticed that Volanda had her tape
recorder at the time.  Shirley feels that Volanda is constantly challenging her
work by questioning her on tape.  Shirley observed one day in mid February
that her charting information had been changed and there were no doctor's

orders to support the change and when asked, none of the other nurses on staff knew anything about the change and when Shirley approached Volanda about the charting discrepancy, she responded by shrugging her shoulders and saying "um."   Shirley stated that she is simply "scared" of Volanda and feels harassed, challenged and coerced.

(*Id.*, Att. 6, ex. 1.)

Plaintiff contends, "Naugher's statement related that Beck 'felt that Volanda is constantly challenging her work by questioning her on tape.'  Beck specifically denied making that statement to Naugher, alleging Naugher took the statement out of context."

(Doc. 30 at 16 (citing doc. 27, Att. 9 at 59).)

Beck testified regarding this portion of her complaint as follows:

A. . . . When she asked me about the resignation, that's when I thought she was taping me.

Q. Okay.  That's kind of the next sentence or two in your statement.  If you'll look at that, it says "According to Shirley, Volanda approached her on February 14th and asked her 'Shirley how do you resign here?'"  Did you respond to that question?

A. Yes, I did.

Q. What did you say?

A. I started to be smart with her, but then I  . . . .  I thought about it.  When I thought about her recording me, I thought I best give her a pretty decent answer.  So I said, "Why don't you ask Jill."

Q. Now, in the next sentence there in your statement, it says "Shirley noticed that Volanda had her tape recorder at the time."

A. I noticed she had her hand in her pocket at the time.

Q. . . . So you didn't actually see a tape recorder –

8

A. No.

Q, – or hear a click or anything that would indicate to you a tape recorder, she just had her hand in her lab coat pocket?

A. Yes.

Q. . . . The next sentence says "Shirley feels that Volanda is constantly challenging her work by questioning her on tape." Now, again, the part of it being on tape, you never saw a tape recorder, you just believed that she might have one and was recording you, right?

A. That's right.

Q. Tell me, where it says "Volanda is constantly challenging her work," what work of yours did [plaintiff] challenge?

. . .

A. I think that's what Allison had – she might have taken that out of context concerning the resignation.

Q. So you're saying you never made a statement that you felt Volanda was constantly challenging your work?

A. No.

(Doc. 27, Att. 9 at 56-59.)

Gabrielle Warner, a Care Associate, told Naugher that plaintiff had tape recorded a conversation between Warner, plaintiff and other employees. (*Id.*, Att. 10 at 29-31; *id.*, Att. 5 at 53; *id.*, Att. 6, ex. 3.) Warner told Naugher that after this incident she was uncomfortable working with plaintiff. (*Id.*, Att. 10 at 28-29, 36-37.) Naugher's notes of her interview with Warner state:

The HR office contacted Gabrielle because her name was given as a witness to actually seeing the tape recorder that Volanda brings to work. When asked if she actually saw the tape recorder, Gabrielle answered yes. Gabrielle stated that Volanda usually keeps the tape recorder in her jacket pocket and has observed it being turned on. Gabrielle stated that once when she and several other employees were talking and Volanda then took the tape recorder from her pocket, pressed rewind, and then played back what the employees were discussing. Gabrielle stated that she felt this was inappropriate and this made her uncomfortable. When asked if she felt intimidated by Volanda, Gabrielle answered yes but she didn't say anything.

(*Id.*, Att. 6, ex. 3.)

Based on the statements of her coworkers, Naugher decided that plaintiff should be suspended pending an investigation. (*Id.*, Att. 5 at 61, 98-99.) On February 21, 2003, Naugher called plaintiff and told her not to return to work. (*Id.*, Att. 2 at 158-59.) Later, Naugher called plaintiff and scheduled a meeting for February 27, 2003. (*Id.* at 160.)

On February 27, 2003, plaintiff met with Naugher and Eddie Cummings, Director of Assisted Living, to discuss the reports of plaintiff's coworkers. (*Id.*, Att. 7 at 13, 33; *id.*, Att. 5 at 67; *id.*, Att. 2 at 160.) Naugher told plaintiff that her coworkers "felt that [plaintiff] was coercing and intimidating them and tape-recording them and they were afraid of me and afraid to come to work." (*Id.*, Att. 3, ex. 2 ¶ 2(E).) Plaintiff tried to tape record this meeting, but her attempt was unsuccessful. (*Id.*, Att. 2 at 18-19.) When asked by Naugher if she had recorded any Somerby employee, plaintiff did not tell Naugher that she was attempting to record their meeting. (*Id.* at 180-82.)

Naugher also asked plaintiff about her employment status with the VA and whether plaintiff was on leave from the VA when she began working for defendant. (*Id.* at 162-63.)

10

Plaintiff did not tell Naugher that she was on FMLA leave from the VA when she began

working for defendant.  (*Id.* at 163-64.)  Plaintiff testified that Naugher asked her why she

was suing the VA, and plaintiff testified that she told Naugher that her lawsuit against the

VA was personal business.  (*Id.* at 164-67.)  Plaintiff testified:

> A.  The first thing she asked me about the VA, she asked me was I employed at the VA.  And I responded yes.  She asked me was I on their payroll and I told them, no, I'm not on their payroll, not receiving any pay.

> She asked me was I on leave and I told her yes.  She asked me was I on administrative leave, medical leave, sick leave.  She asked me – I told her that I had requested a leave of absence and without pay.   . . .

> Q.  Did you define that as FMLA leave?

> A.  I don't think  – I don't know if I did.  I did – I know I told her I was on leave without pay.  And it was leave that I requested.

. . .

> Q.  Were you trying to avoid telling her that you were on FMLA leave?

> A.  No, ma'am, I was not.

> Q.  Why didn't you tell her you were on FMLA leave?

> A.  I – it just didn't occur to me.  I just told her I was on leave without pay that I had requested.

> Q.  What else did she say?

> A.  She asked me why was I suing the VA and what were my EEOs about.  I informed her – told her that I had already – stuff that I had already told her prior to us talking before.

. . .

11

A.   [On February 7th] I told her why I was suing the VA and my attorney talked to her as well, telling her that I had EEO cases against them, That's what I'm talking about.

. . .

A.   And I told her again that it was the same stuff that I had told her February 7th, that my attorney had discussed with her February 7th.  She in return asked me – well, you didn't tell me – she said, you told me you . . . were suing them but you didn't tell me what your suit was all about.  And I told her that I did.  I told her that it was my EEO cases.  She said, but you are not telling me what those EEO are.  And I told her that I couldn't.

She in return told – I told her that it had nothing to do with Somerby .
. . .

(*Id.* at  162-66.)  Naugher asked plaintiff if she had told her that she was not supposed to be working.  (*Id.*, Att. 3, ex. 2 ¶ 2(E).)  Plaintiff testified that she "never told them that [she] wasn't supposed to be working at Somerby."  (*Id.*, Att. 2 at 168.)

Also, Naugher asked plaintiff if there was "anything wrong with [her] license."  (*Id.* at 168.)  Plaintiff responded that Naugher could check with the Board of Nursing; to which Naugher replied that she had checked.  (*Id.*)  Plaintiff testified that Naugher told her in the meeting that she thought she had learned that something was wrong with plaintiff's nursing license from plaintiff.  (*Id.* at 168-69.)

Naugher and Cummings testified that plaintiff was uncooperative and would not respond to their questions.  (*Id.*, Att. 5 at 50-52, 64-65; *id.*, Att. 7 at 32, 35-36, 50-51.)  Plaintiff testified that Naugher told her she was being "uncooperative and unprofessional

12

because [she] refused to tell [Naugher] any more . . . about the VA." (*Id.*, Att. 2 at 171-72.)

Naugher asked plaintiff to leave her office. (*Id.* at 172; *id*, Att. 5 at 50-52, 68-69.)

After this meeting, Naugher sent plaintiff a letter, notifying her that she was being

placed on a leave of absence pending the investigation into the complaints. (*Id.*, Att. 6, ex.

7.) The letter stated:

> You were placed on Leave of Absence effective February 21, 2003. This letter
> is a follow-up of our conversation this morning concerning issues of your
> employment status with the Veterans Administration as well as complaints
> received from Somerby employees.
>
> Last week during a brief conversation, after learning that the VA contacted this
> office to verify your employment, you told me[,] "I am not supposed to be
> working and they (referring to the VA) are trying to take my license." Based
> on that information, I attempted to learn why you would be working with us
> when you were not supposed to be working at all. In the process, I asked to
> speak with you to learn more information. However, when you were in my
> office this morning and I asked you to clarify your employment status with the
> Veterans Administration, you refused to cooperate and told me it was "none
> of [my] business." I asked you again, and once again you told me it was "none
> of [my] business."
>
> Please understand that the information you shared with me initially causes
> great concern regarding the status of your license and your trustworthiness,
> both of which are critical in our willingness to allow you to care for our
> residents. If you are working when you are not supposed to be, it could be that
> you have not been candid or truthful with your other employer, and your
> trustworthiness is very important, especially in a patient care setting.
>
> Also contributing to the decision to place you on Leave of Absence are
> employee complaints. We intended to address this issue with you as well but
> your refusal to cooperate prevented that from happening. At least three of your
> co-workers have come to this office to file official complaints that they are
> "afraid" to work with you and feel intimidated and coerced. The complaints
> consist of employees' belief that they are being tape recorded without their
> permission, their perception of being "set up" by your making incorrect chart

13

entries and their perception that you are being rude and mean.  While these concerns may well be termination offenses, we wanted to hear from you in reaction to them before deciding upon final action.

Due to this information, you are being placed on a Leave of Absence until we can complete our investigation into these various matters.  If you refuse to provide us with additional information in response to these issues, you will leave us no choice but to proceed with our decision as to the action we deem appropriate based upon the information we currently have and are able to gather without your cooperation.  We would not advise this approach if you wish to retain your job here.

However, if based upon this information you now wish to cooperate more fully, please contact me immediately.  We will require you to provide a release for us to obtain information about your circumstances with the VA and will need to hear your response to the complaints outlined above.

(*Id.*)

In response, plaintiff and her counsel sent letters to Naugher.  (*Id.*, Att. 2 at 178-80; *id.*, Att. 6, exs. 5-6.)  In her letter, plaintiff denies she told Naugher that she was "not suppose[d] to be working," although, she concedes that Naugher "heard something like this" from the VA.  (*Id.*, Att. 6, ex. 6 at 2.)  Plaintiff also denied recording her coworkers or changing a chart.  (*Id.* at 2-3.)  She stated:

I am always very professional, and I pride myself on that fact, I critique my work, which includes all of my charting.  If I have to say so myself, that as long as I've been employed at Somerby, I've never had any complaints on my work ethics or my coworkers fear me.  Although I believe that the picture in which you had described that the Birmingham VA detective had painted me has caused this situation to arise, I sincerely hope that we can work through this, in the meanwhile, you have my full cooperation.

(*Id.* at 3.)

14

Vance Holder, defendant's Executive Director,  based on information from Naugher and Cummings and "upon advice of counsel," decided to terminate plaintiff.  (*Id.*, Att. 4 ¶ 3.)  On March 12, 2003, defendant's counsel sent plaintiff's counsel a letter terminating plaintiff's employment.  (Doc. 30, Ex. 6.)  This letter stated:

> This letter is not intended to address each and every item of disagreement my client has with the contents of your letter or with the contents of Ms. Jones' letter. . . .  However, two significant concerns are raised by the correspondence.

> First, Ms. Jones denies making a statement that Ms. Naugher clearly and unequivocally heard her make.  Ms. Naugher is the Somerby representative with whom Ms. Jones has had several discussions.  As Ms. Naugher explains in her letter to Ms. Jones, after Ms. Jones learned that Ms. Naugher had been contacted by the VA, Ms. Jones said, "I . . . am not supposed to be working . . . ."  Ms. Naugher later met with Ms. Jones to explain concern about Ms. Jones' comment.  Ms. Jones did not deny making the statement and refused to cooperate.  Now, however, she claims to be willing to cooperate but denies making the statement.  The denial – which at best is characterized as "delayed" – compounded by a previously emphatic refusal to cooperate (but with no denial of the comment) leads my client to conclude that it cannot place trust in your client's statements.

> The correspondence also appears to blame the VA for the Somerby's inquiry.  That implied or express message is not accurate.  Ms. Naugher received a request for verification of employment from the VA.  She responded by verifying employment.  In a subsequent, fairly casual conversation with Ms. Jones, Ms. Naugher asked if Ms. Jones had "gotten the job at the VA."  Ms. Jones was visibly taken aback by the comment and asked what Ms. Naugher was talking about.  When Ms. Naugher shared that she had received a request for verification of employment.  It was at that time that Ms. Jones said, "I am not supposed to be working and they are trying to take my license."  The various characterizations of the VA's inquiry as inappropriate or disparaging of your client are not accurate.  Ms. Jones at best has mischaracterized conversations with Ms. Naugher in an apparent attempt to assist some pending claim against the VA.  This leads my client to conclude

that it cannot place trust in your client's ability to characterize accurately the statements of my client's representatives.

In short, the correspondence leads my client to the conclusion that it cannot trust that Ms. Jones will take responsibility for what she says and that it cannot trust that she will responsibly and accurately interpret or characterize what is said to her. Rather than calm the concerns about your client's trustworthiness, the correspondence has increased those concerns. My client is not willing to continue to employ Ms. Jones under these circumstances.

For this reason, my client is terminating Ms. Jones' employment. Normally, such information would be directed to Ms. Jones, in person and in private. My client also does not relish having to come to this conclusion or to have to share it in this manner. However, given her previous denial of what she said to Ms. Naugher and her mischaracterizations of what Ms. Naugher said to her, my client believes it best to inform you in writing so that there is no misunderstanding or mischaracterization.

(*Id.*)

Plaintiff testified that she understood her employment with defendant was terminated because she was uncooperative, untrustworthy and misleading. (Doc. 27, Att. 2 at 193-94.) In an affidavit submitted in support of defendant's Motion for Summary Judgment, Holder stated –

Based on [plaintiff's] initial failure to cooperate in the internal investigation, which constituted insubordination, and because of concerns regarding her honesty and trustworthiness given that she was entrusted to care for our residents, I, along with input from Mr. Cummings and Ms. Naugher, and upon advice of counsel, made the decision to terminate [plaintiff's] employment. This decision was made in light of concerns of the safety of staff and residents based on the complaints of [plaintiff's] coworkers. Although we were unable to complete the investigation into the complaints of [plaintiff's] coworkers in its entirety, we believed that we had sufficient information to support this decision. [Plaintiff's] lawsuit against her prior employer, the VA, did not have anything to do with this decision.

16

(*Id.*, Att. 4¶ 3.)

### III. <u>DISCUSSION</u>

Plaintiff contends that she was terminated by defendant in retaliation for filing complaints of discrimination and retaliation against the VA.  Title VII makes it –

> an unlawful employment practice for an employer to discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].

42 U.S.C. § 2000e-3.

Because plaintiff has presented circumstantial evidence to prove [her] retaliation claim, the court's analysis of such claim is governed by the tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  *See Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir.1993); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993).  Under this framework, plaintiff bears the initial burden of establishing a prima facie case of retaliation.  *See Burdine*, 450 U.S. at 252-53.  If plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment decision.  *McDonnell Douglas*, 411 U.S. at 802.  If defendant succeeds in carrying this burden, then plaintiff must prove that defendant's articulated reason is a mere pretext for unlawful retaliation.  *See Burdine*, 450 U.S. at 253.  At all times, plaintiff bears the burden of

17

persuasion on the ultimate question of whether defendant acted with an unlawful motive. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). If plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether defendant's articulated reason is pretextual, defendant is entitled to summary judgment on plaintiff's claim. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997), *cert. denied sub. nom Combs v. Meadowcraft Co.*, 522 U.S. 1045 (1998).

In order to establish a prima facie case of retaliation, plaintiff must show: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *Hairston*, 9 F.3d at 919. "The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)(quoting *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir.1998)(quoting *E.E.O.C. v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir.1993)))(internal quotations omitted). "Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action. The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff." *Id.* (citations omitted).

18

The court assumes, without deciding, that plaintiff can establish a prima facie case of retaliation "because [the court] find[s] that [defendant's] legitimate reason[ ] for the decision [is] dispositive." *Pennington*, 261 F.3d at 1266.

Plaintiff may establish that an articulated reason is a pretext for retaliation "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989)(quoting *Goldstein v. Manhattan Industries*, 758 F.2d 1435, 1445 (11th Cir. 1985)(citing *Burdine*, 450 U.S. at 256), *cert. denied* 474 U.S. 1005 (1985)).  Plaintiff argues that defendant's articulated reasons for her termination are pretextual.  (Doc. 30, at 15.)  Therefore, to establish that defendant's articulated reasons are unworthy of credence, plaintiff must offer evidence that "casts sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)); *see also Clay v. Holy Cross Hospital*, 253 F.3d 1000, 1005-06 (7th Cir. 2001)("Pretext means a dishonest explanation, a lie rather than an oddity or an error.  A 'pretext for discrimination' means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks.  On the issue of pretext, our only concern is the honesty of the employer's explanation.  Thus, even if [defendant's] reasons for [plaintiff's] termination were mistaken,

ill considered or foolish, so long as [defendant] honestly believed those reasons, pretext has not been shown.")(internal citations and quotations omitted.)  The law in this Circuit is well established that "[t]he employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.  'While an employer's . . . course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the [articulated] reason was a pretext for illegal discrimination.  The employer's stated legitimate reason . . . does not have to be a reason that the . . . jurors would act on or approve.'"  *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984)(quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n.6 (1st Cir. 1979). The law is clear that the "pretext analysis focuses on a narrow question:  Would the proffered evidence allow a reasonable factfinder to conclude that the articulated reason for the decision was not the real reason?"  *Walker v. Prudential Property and Cas. Ins. Co.*, 286 F.3d 1270, 1276 (11th Cir. 2002)(citations omitted).

Defendant contends that it decided to terminate plaintiff (1) because she failed to cooperate in an internal investigation, which it considered insubordination; (2) because it had concerns about her honesty and trustworthiness; and (3) because it was concerned with the safety of staff and residents in light of complaints from plaintiff's coworkers.  (Doc. 27, Att. 4 ¶ 3.)  Plaintiff contends that defendant's articulated reasons for her termination are not worthy of credence; however, plaintiff's arguments are based on evidence that Naugher was mistaken or wrong about conversations regarding plaintiff's employment with the VA, about

the nature of the coworkers' complaints, and about her failure to cooperate. This evidence is not sufficient to establish that defendant's articulated reasons for her termination were not the real reasons.

Plaintiff has presented no evidence to dispute that Holden, the decisionmaker, did not base his decision to terminate plaintiff on (1) plaintiff's "initial failure to cooperate in the internal investigation," (*id*), as set forth in Naugher's letter to plaintiff, (*id.*, Att. 3, ex. 7); (2) "concerns regarding [plaintiff's] honesty and trustworthiness," (*id.*, Att. 4 ¶ 3), as set forth in the termination letter, (doc. 30, Ex. 6); and (3) "concerns of the safety of staff and residents based on the complaints of [plaintiff's] coworkers," (doc. 27, Att. 4 ¶ 3; *id.*, Att. 6, exs. 1-3).

Although plaintiff's evidence may raise a question of fact as to whether Holden's decision was wrong or unfair, she has not presented any evidence to dispute that his articulated reasons are the "real reasons" for his decision.

The court finds that plaintiff has not presented substantial evidence of a disputed issue of fact regarding the credence of defendant's articulated reasons for her termination. Therefore, the court concludes that defendant is entitled to judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law. An Order granting

21

defendant's Motion for Summary Judgment, (doc. 27),  will be entered contemporaneously

with this Memorandum Opinion.

      **DONE** this 13th day of March, 2006.


*Sharon Lovelace Blackburn*
_____
SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE